OPINION
Dorothy A. Poindexter, plaintiff-appellant, appeals the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations. We affirm.
Appellant and Timothy D. Poindexter, defendant-appellee, were married on September 14, 1990. On May 26, 1995, appellant filed for divorce claiming that appellee was "guilty of gross neglect of duty and incompatibility." She asked the court to award her temporary and permanent spousal support, a one-half interest in all household furnishings and effects, a one-half interest in all the real and personal property, and an equitable distribution of all assets and liabilities of the parties. Appellant listed as her assets $0 in cash and wrote "yes" for the cash value of her life insurance. Appellant provided an affidavit supporting a request for a restraining order against appellee. On July 26, 1995, appellant filed an affidavit sworn and subscribed by appellant on July 21, 1995, detailing her employment history, assets, expenses, and debts. Appellant also provided another affidavit on August 30, 1995, supporting her motion for temporary spousal support.
On September 6, 1995, a magistrate issued an order requiring appellee to pay appellant $1,000 per month in temporary spousal support. This amount was later modified to $800 per month. Appellee paid appellant temporary spousal support over a two-year period due to the granting of several continuances. A hearing scheduled for February 1, 1996, was continued until April 10, 1996, due to appellant being ill. A hearing to be held on February 21, 1996, was continued until June 3, 1996, because of appellant's failure to complete discovery. A hearing set for March 28, 1996, regarding appellee's motion to compel appellant to comply with the discovery requests, was continued until May 3, 1996, in order to allow appellant to voluntarily comply with the requests. The April 10, 1996 hearing was continued until May 20, 1996, in order to allow the parties to obtain additional information. A hearing set for June 3, 1996, was continued until September 11, 1996, because discovery had not been completed.
In July 1996, appellant changed attorneys. The September 11, 1996 hearing was continued until November 21, 1996, because appellant's new counsel had a vacation scheduled at that time. The November 21, 1996 hearing was continued until March 5, 1997, because "[d]iscovery has not been completed [appellant] has been ill." On March 4, 1997, appellant's counsel requested a continuance of the March 5, 1997 hearing due to appellant being incompetent. Appellant's counsel also requested the court appoint a guardian ad litem for appellant. On May 22, 1997, the court appointed a guardian ad litem for appellant. Thereafter, appellant's counsel filed an application for a guardian to be appointed with the Franklin County Probate Court. The parties' trial date of July 31, 1997, was continued until November 6, 1997, in order to allow the probate court to rule on appellant's guardian application.
On August 12, 1997, appellee filed a motion to allow him to escrow his spousal support payments. A memorandum supporting appellee's motion states in part:
 This case has been pending since May of 1995. [Appellee] has attempted to work out depositions and other discovery, but because of [appellant's] mental illness, no progress has been made because she will not follow her doctor's instructions regarding treatment.
 Counsel has been forced to secure both a Guardian Ad Litem and a Guardian in Probate Court, but [appellant's] failure to treat her disorder is forcing the Court to delay trial and force [appellee] to continue to pay spousal support. The only way this case is going to proceed is an escrow order which will motivate [appellant] to secure treatment so she can participate in the trial process.
On October 8, 1997, appellee moved "the Court for an Order finding [appellant] in contempt for harassing [appellee] by phone at his place of employment, his home and his girlfriend's home and for sending him annoying letters, all contrary to the Temporary Restraining Order issued in this case." In a motion to compel appellant to attend a deposition, appellee's counsel stated that appellant "has apparently ignored her psychiatrist's report regarding treatment and appears not interested in ever bringing this case to conclusion." On March 30, 1998, appellee withdrew his motions for contempt and to escrow his spousal support payments.
On May 13, 1998, almost three years after appellant filed for divorce, a trial was held concerning the parties' divorce. Even though she had been subpoenaed to appear, appellant was not present at the trial.[1] Four witnesses testified at the trial: appellee; Alfred Stone, a friend of appellee; Margaret Poindexter, appellee's mother; and Bryan Johnson, appellant's court-appointed guardian. A deposition of Dr. Ann Snyder, a psychiatrist who treated appellant, was also submitted into evidence.
Appellee testified that he first met appellant in 1990. Appellee stated that after he told appellant that he was an architect at Spencer and Spencer Architects, she told him that her father was A.G. Gaston, a millionaire living in Birmingham, Alabama. She also said that her father was "interested in finding an architect to build a landmark building with his name on it." She claimed that she was his only child and that she was "an attorney, a doctor, a nurse, registered nurse, at one time a pilot. She owned horses at the Scioto Downs." Appellee stated that about a month later he received a phone call from a person identifying himself as A.G. Gaston. The person told appellee that he had talked with appellant and he wanted to work with appellee and his employer on an architectural project. Appellee testified that he received more calls from this individual over a two-to-three month period. During the same period of time, the parties began to develop a romantic relationship.
Stone testified that appellant also told him about A.G. Gaston. Stone stated that she told him:
 * * * lots of information about her relationship with old man Gaston in Alabama and his home and his Plantation that he was supposed to have left her.
Stone also testified that appellant usually "just rattled on about everything. She loved everything about herself and her money."
Appellee testified that in August 1990, appellant told him that she was pregnant. Also, during this time, appellee's employer was making arrangements to meet with A.G. Gaston. Appellee testified:
 Well, that date was set and my principal had everyone staying in the office, staying to meet with this gentleman and to entertain his ideas for his building. He had catering service brought in, he had a full staff on hand and the day went by and no sign of A.G. Gaston. I called [appellant] and [appellant] said well, he must be tied up in a meeting with Mr. Wexner and he wouldn't be able to make it and would give us a call later.
* * *
 [Appellant] said that the reason he didn't continue the conversations with me was because he had found out that she was pregnant and that * * * he disapproved of that and therefore he didn't want to have anything to do with a joint venture with myself or the firm.
 Later I found out that through my principal who is a graduate of Tuskegee, which A.G. Gaston was on the board at the time, he called A.G. Gaston himself and Mr. Gaston had no knowledge * * * of [appellant], myself or even Spencer and Spencer Architects, so forth in Columbus, Ohio.
Appellee testified that they were married on September 14, 1990, one month after appellant told him she was pregnant. Appellee stated that appellant "said she was pregnant with one child and it escalated to quadruplets and at that time I wanted to see a sonogram then." Appellant never showed him any sonograms and when appellee confronted appellant and "told her I knew she was lying to me and I was very upset * * * she said that she must have * * * had a miscarriage during one of her sick spells with her gallstone problem."
Appellee also testified that he was terminated from his architect position at Spencer and Spencer Architects because of the A.G. Gaston incident. He stated that "after I was terminated, I had plenty of time on my hands. I was curious as to who I was involved with, married to at the time and I proceeded to do my own in-house investigation." He learned that appellant did not own the house they were living in even though appellant had told him that she owned the house. He also learned that A.G. Gaston only had one son and that son was deceased. When he confronted her with this information, she told him that "the publications [about A.G. Gaston] were untrue and that he was a very secretive person and he was always paranoid about the public knowing his business." Appellee testified that on their first-year wedding anniversary, "I left and basically told her everything that I found out about her."
The parties were apart for approximately six months. Appellee stated that he began working for Federal Express as a courier. He also stated:
 During that time she told me that she was turning a new leaf and she wanted to make this house a home so to speak and she proceeded to furnish every room in the house with furniture from Ethan Allen to Echenrode, Lazarus and there were six rooms of furniture purchased, including a basement which she had decorated for myself with a rolltop desk, leather furniture, 32-inch screen TV, pictures, oil paintings. Then upstairs in the living room there was more sofas, coffee tables, wallpaper, fresh coat of paint throughout the house.
Appellee stated that shortly after this the parties got back together.
Appellee testified that while they were married, appellant did not work because of knee problems. Appellee also testified that he believed the source of appellant's money came from her father. Appellee further testified that he thought appellant received a large sum of money from an insurance settlement following an automobile accident involving appellant in 1986. Appellee also stated that appellant told him that she was a co-owner of some horses at Scioto Downs. He stated that appellant once "actually took me out to Scioto Downs and introduced me to some of the jockeys that she knew, some of the people that were also owners of the horses she owned, co-owners."
Concerning appellant's financial manipulations, Margaret Poindexter testified that appellant used Margaret's name to set up credit accounts with various stores. Margaret also testified that appellant hid the accounts from her and appellee by having the bills mailed to appellant's daughter. Margaret also stated that after appellant "had all the bills transferred to me from the post office * * * I asked her about them and the only thing she told me is don't tell [appellee]." Margaret also testified that when she asked appellant how she was going to pay the bills, appellant told her "they're in your name," implying that the bills were Margaret's responsibility. Margaret then testified that only after she threatened to sue appellant for the money, appellant paid her approximately $10,000 in cashier checks and/or money orders.
As appellee became more and more suspicious of appellant's actions, he testified that he looked through the house and found "large amounts of money either under plants, in the pillowcases, in the refrigerator, I mean, thousands of dollars, bundles of money." Appellee stated that once he found $19,000 in cash under an artificial silk plant. Appellee testified that he finally separated from appellant in February 1995. He also stated that he had a private investigator do a background check on appellant and he found that she had a criminal record and past psychiatric problems. Appellee also testified that he discovered appellant was using other names besides Dorothy Poindexter or Dorothy Norman. Appellee stated that she "would use Jean Joseph, Dorothy Thompson, Dorothy Pippons, Margaret Poindexter, different aliases."[2] Appellee further testified that appellant admitted to him that she was the person who claimed to be A.G. Gaston over the telephone.
Johnson was called as a witness for appellant. Johnson testified that after he was appointed by the probate court to be appellant's guardian, he attempted to meet with her on several occasions. Johnson stated that he was only able to personally meet with appellant once, and that he may have talked to her over the phone on several occasions. Johnson also stated that he was not certain whether he was talking to appellant over the phone. Johnson testified that he felt appellant "could in no way participate in this proceeding."
Concerning appellant's living conditions, Johnson stated that her apartment cost $708 a month. Johnson also stated:
 It is a nice apartment up in Little Turtle, very nice neighborhood-type setting. When I went into the apartment it's, I would say, lavishly furnished, really beautiful furnishings and an extraordinary number of furnishings. It's as full as it can be without obstructing walkways through there; sofas and couches and tables and ottomans.
 There is artwork on the walls. There's [sic] heavy draperies that she keeps closed because she's convinced that people are spying on her. Very dark, lights were off in the middle of the day but it was neat, it was clean. It was well maintained but it was a very nice place.
He testified that he was unable to get much information from appellant because "she is quite paranoid and as soon as you go too far with your questions she cuts off the conversation." When he talked to her on the telephone, he described her as "guarded, evasive as to any questions, paranoid." Johnson further testified that he did not discuss with appellant how she managed to maintain her lifestyle before she married appellee. Johnson stated that he was unable to learn from appellant the whereabouts of a Mercedes Benz the parties had purchased and had been in appellant's possession after they had separated.
On August 10, 1998, the trial court issued a judgment entry granting the parties a divorce. The court allowed the parties to retain any retirement and/or pension plans they may have had. The court found that neither party should be required to pay the other party spousal support. The court also ordered "that each party is awarded the furniture, clothing, jewelry and personal possessions in his/her possession." The court also noted that based upon the testimony of appellee, "Alfred Stone, and Margaret Poindexter, that [appellant] was quite adept at convincing other people she was something she was not." Appellant appeals this decision and presents the following three assignments of error:
 I. THE TRIAL COURT'S REFUSAL TO ORDER THE DEFENDANT TO PAY SPOUSAL SUPPORT IS AN ABUSE OF DISCRETION AND CONTRARY TO LAW.
 II. THE TRIAL COURT'S DEFINITION AND ALLOCATION OF THE MARITAL ASSETS IS AN ABUSE OF DISCRETION AND NOT SUPPORTED BY THE EVIDENCE.
 III. THE TRIAL COURT'S REFUSAL TO ORDER PAYMENT OF THE GUARDIAN'S FEES IS ERROR.
Appellant argues in her first assignment of error that the trial court abused its discretion by failing to order appellee to pay her spousal support. Appellant contends that she is totally and permanently disabled, without income resources, and that she should be entitled to appellee's "substantial income resources."
In Ohio, the granting of spousal support is defined as "any payment or payments to be made to a spouse or former spouse, or to a third party for the benefit of a spouse or a former spouse, that is both for sustenance and for support of the spouse or former spouse." R.C. 3105.18(A). In order to determine: (1) whether spousal support is appropriate and reasonable, (2) the nature, amount and terms of payment of spousal support, and (3) the duration of spousal support, the court shall consider all of the following factors pursuant to R.C. 3105.18(C)(1):
 (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under § 3105.171 [3105.17.1] of the Revised Code;
(b) The relative earning abilities of the parties;
 (c) The ages and the physical, mental, and emotional conditions of the parties;
(d) The retirement benefits of the parties;
(e) The duration of the marriage;
 (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside of the home;
 (g) The standard of living of the parties established during the marriage;
(h) The relative extent of education of the parties;
 (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 (k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 (l) The tax consequences, for each party, of an award of spousal support;
 (m) The lost income production capacity of either party that resulted from the party's marital responsibilities;
 (n) Any other factor that the court expressly finds to be relevant and equitable.
In a divorce proceeding, a reviewing court should not reverse a trial court's decision regarding the amount of spousal support award unless it finds that the trial court abused its discretion.Carnahan v. Carnahan (1997), 118 Ohio App.3d 393, 399. "In determining if there was an abuse of discretion, a reviewing court must look at `the totality of the circumstances' to determine if the trial court acted unreasonably, arbitrarily, or unconscionably." Id. quoting Kunkle v. Kunkle (1990), 51 Ohio St.3d 64,67. If the trial court has considered all of the factors required by R.C. 3105.18(C)(1)(a) through (n) and the evidence supports the trial court's findings, no abuse of discretion has occurred. Zimmerman v. Zimmerman (Feb. 25, 1999), Allen App. No. 1-98-45, unreported.
A review of the trial court's opinion shows that the court did not make its decision "unreasonably, arbitrarily, or unconscionably." Instead, the opinion shows that the court considered and commented on each of the factors contained in R.C.3105.18(C)(1)(a) through (n). The trial court did not determine appellant's relative earning ability pursuant to R.C.3105.18(C)(2)(b) because she "is totally disabled as a result of mental illness." The court found that appellant's "ability to acquire education training or job experience is most likely impossible and irrelevant in this case." The court also found that "neither party lost income production capacity as a result of this marriage." Concerning "[a]ny other factor that the court expressly finds to be relevant and equitable" pursuant to R.C.3105.18(C)(1)(n), the court stated at length:
 The court finds that the marriage is of a short duration especially in light of the fact that the parities separated in 1995. [Appellee] has paid temporary spousal support since April 1996, thus he has paid for two years and four months as of the date of this decree. For [appellee] to continue to pay spousal support, while potentially necessary, would only be postponing the inevitable which is that [appellant] will probably remain on [Supplemental Security Income] and rely on the government for her medical care for the rest of her life unless her mental illness is controlled. The court finds further, that based on the testimony of [appellee], Alfred Stone, and Margaret Poindexter, that [appellant] was quite adept at convincing other people she was something she was not. While [appellant's] counsel may have tried to imply that [appellee] was in serious debt and possibly a "gold digger" when he married [appellant], it does appear that she told [appellee] she was pregnant in August 1990 and they married approximately one month later. Further, [appellee] suffered embarrassment, and lost a job and possible career path as a result of [appellant's] deceptions. Any spousal support that [appellant] receives would reduce, dollar for dollar, any SSI benefits [appellant] would receive.
The court's decision concerning spousal support was hampered by appellant's nondisclosure of her financial information. Throughout the proceedings, appellee attempted to obtain information from appellant about her financial assets, but his discovery efforts were unsuccessful. Appellee presented evidence that throughout their marriage appellant hid information about her assets and, in fact, hid large sums of cash in their home. Appellant also received $29,120 in temporary spousal support from appellee over a twenty-eight month period.
Appellant argues that she should receive spousal support because she is permanently disabled. However, it is questionable that appellant's mental disability alone is a sufficient reason to justify an award of spousal support. Another appellate court has addressed a similar situation regarding total disability by holding that a former spouse who is "totally and permanently disabled, does not have the ability to earn income in the future" is not automatically entitled to spousal support simply because the other spouse "is presently working, earning income and has a potential to continue to earn income and increase the same."Young v. Young (Jan. 22, 1998), Columbiana App. No. 96-CO-26, unreported. See, also, Green v. Green (1989), 64 Ohio App.3d 37,41.
A trial court can also grant permanent spousal support in many situations including "cases involving a marriage of long duration, parties of advanced age or a homemaker-spouse with little opportunity to develop meaningful employment outside the home." Albanese v. Albanese (May 25, 1999), Franklin App. No. 98AP-1033, unreported, quoting Kunkle, paragraph one of the syllabus.In the present case, the court found that the parties' marriage "is of a short duration especially in light of the fact that the parties separated in 1995." The trial court also held that "neither party lost income production capacity as a result of this marriage." Additionally, appellant was born on November 27, 1944, and was fifty-four years old at the time of trial. These findings support a holding that appellant is not entitled to permanent spousal support.
Accordingly, after having reviewed the complete record, we find that the trial court did not abuse its discretion in failing to award appellant spousal support. The trial court addressed each of the factors in R.C. 3105.18(C)(1)(a) through (n) and the record supports the trial court's findings. Appellant's first assignment of error is overruled.
Appellant argues in her second assignment of error that the trial court's allocation of the marital assets was an abuse of its discretion. Appellant contends that the trial court did not make a 50/50 division of the marital assets that were presented in the trial. Appellant instead claims that the court awarded appellee "in essence * * * all of the marital assets." We disagree.
In reviewing the equity of a division of property, the trial court's judgment cannot be overturned on appeal absent a showing that the trial court abused its discretion in formulating its division of the marital assets and liabilities of the parties.Martin v. Martin (1985), 18 Ohio St.3d 292, 294-295; Mullen v.Mullen (July 13, 1998), Warren App. No. CA97-08-089, unreported. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. "Throughout this analysis, the trial court's property division should be viewed as a whole in determining whether it has achieved an equitable and fair division of marital assets." Szerlip v. Szerlip (1998), 129 Ohio App.3d 506, 511.
R.C. 3105.171(C)(1) requires "the division of marital property shall be equal. If an equal division of martial property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable." In an action for divorce, the trial court is required to determine what constitutes marital property and what constitutes separate property, and an appellate review of the trial court's classification is limited to whether the trial court's determination is against the manifest weight of the evidence. Crowder v. Crowder (Aug. 5, 1999), Franklin App. No. 98AP-1124, unreported. If there is some competent, credible evidence to support the trial court's division of property in domestic cases, there is no abuse of discretion.Middendorf v. Middendorf (1998), 82 Ohio St.3d 397, 401.
In the present case, appellee presented evidence concerning his assets. Appellant's counsel was given the opportunity to cross-examine appellee concerning these assets. Appellant did not respond to appellee's discovery requests and failed to disclose any financial information to her court-appointed guardian. Appellee was not given the opportunity to cross-examine appellant concerning her assets. Appellant's guardian was only able to testify that appellant's apartment was "lavishly furnished, really beautiful furnishings and an extraordinary number of furnishings. * * * It was well maintained but it was a very nice place." Beyond Johnson's comments, little evidence exists in the record concerning appellant's assets.
While appellant argues that, based upon the record, she had fewer assets in her possession when compared to appellee's assets, the reason for this disparity is not because of an abuse of discretion by the trial court. Instead, the reason is appellant's nondisclosure of her assets. When appellant filed for divorce, she had the mental capacity to present information to support her claim that she was destitute in order to qualify for temporary spousal support. Appellant's mental abilities quickly diminished after appellee attempted to uncover her assets.
It is unclear whether appellant's continuing attempts to hide her assets were the result of her mental instability or to hide evidence from the court in order to receive a larger share of property. The record supports both theories. The record shows that appellant hid assets from appellee throughout their marriage. Since appellant never testified or responded to discovery requests, it is possible that appellant has substantial assets. It is also unclear whether appellant accumulated more assets during the parties' marriage. Appellee testified that throughout his marriage to appellant, she always seemed to have money even though she was not working.
Therefore, after a review of the record and considering the unique circumstances of the present case, we find that the trial court did not abuse its discretion. The court attempted to make a fair allocation of the marital assets despite the lack of pertinent information from appellant. Without evidence of appellant's assets, the court found that the parties should retain the assets that were in their possession at the time of the divorce. We find that this was equitable and is supported by competent credible evidence. Appellant's second assignment of error is also overruled.
Appellant argues in her third assignment of error that the court erred by refusing to order payment of guardian fees. Appellant's counsel requested that appellee pay for appellant's guardian fees, which at the time of trial were approximately $2,200. Appellant fails to specifically argue why she is entitled to guardian fees other than arguing that the court erred in its division of the marital assets. A review of R.C. 3105.171 shows that no statutory provision exists regarding the award of guardian fees for an incompetent spouse in a divorce. However, since the trial court determined that appellant should not be awarded guardian's fees as part of its determination that both parties should pay their own attorney fees, we will discuss whether appellant should have been awarded guardian fees in this context.
R.C. 3105.18(H) allows a court to "award reasonable attorney's fees to either party at any stage of the proceedings." "An award of attorney fees under R.C. 3105.18(H) is reviewed under an abuse of discretion standard." Hoynes v. Hoynes (Feb. 16, 2000), Summit App. No. 19201, unreported, following Rand v. Rand (1985),18 Ohio St.3d 356, 359. Regarding an award of attorney fees, another appellate court stated:
 R.C. 3105.18(H) provides that when the court determines to award reasonable attorney's fees, it shall determine whether either party will be prevented from fully litigating his rights, and adequately protecting his interest, the court does not award reasonable attorney fees. Appellant has not argued that she was in any way impeded from being adequately represented in this matter due to a lack of funds for which to pay attorney fees. She argues that she was entitled to fees because of the disparity in income between the parties. Appellant has not demonstrated error in the court's refusal to award attorney fees. [Creighton v. Creighton (Feb. 7, 2000), Stark App. No. 1999CA00065, unreported.]
Appellant does not argue that she should recover guardian fees because she would be prevented from fully litigating her rights or adequately protecting her interests. Instead, appellant argues that her guardian fees should be assessed to appellee because of her lack of funds. We find that the trial court did not abuse its discretion in failing to award appellant guardian fees. Appellant's third assignment of error is overruled.
Appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations is affirmed.
Judgment affirmed.
DESHLER, J., concurs, McCORMAC, J., concurs in part and dissents in part.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.
[1] In a motion filed on June 10, 1998, appellant's counsel requested "an order allowing her to reopen the case and present additional information." In support of the motion, appellant's counsel stated that appellant did not attend the trial because she was "an inpatient for knee implant replacement surgery which was performed on May 15, 1998." Counsel also stated that neither "the Guardian nor present counsel were aware" of this.
[2] Appellee's pretrial statement filed on November 3, 1995, included the following additional names: Dorothy Knowles, Ann Pippens, Dee Daley, Denise Daley, and Dorothy Joseph.